# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

JOSEPH WINSTON CRAWFORD, JR.,
    Plaintiff,

    vs.

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant.

Case No. 1:17-cv-723
Dlott, J.
Litkovitz, M.J.

**REPORT AND
RECOMMENDATION**

Plaintiff Joseph Winston Crawford, Jr., brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits ("DIB"). This matter is before the Court on plaintiff's statement of errors (Doc. 10), the Commissioner's response in opposition (Doc. 15), and plaintiff's reply (Doc. 16).

## I. Procedural Background

Plaintiff filed his application for DIB on September 12, 2013, alleging disability since July 28, 2009, due to lumbar, thoracic, and cervical arthritis; lumbar degenerative disc disease, spondylosis, and radiculopathy; thoracic degenerative disc disease and spondylosis; cervical degenerative disc disease; arthritis; coronary disease; colonic polyps; sleep apnea; chronic pain syndrome; and depression. The application was denied initially and upon reconsideration. Plaintiff, through counsel, requested and was granted a *de novo* hearing before administrative law judge ("ALJ") Andrew Gollin. Plaintiff and a vocational expert ("VE") appeared and testified at the ALJ hearing on May 11, 2016. On June 23, 2016, the ALJ issued a decision denying plaintiff's DIB application. This decision became the final decision of the Commissioner when the Appeals Council denied review on September 28, 2017.

## II. Analysis

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

1) If the claimant is doing substantial gainful activity, the claimant is not disabled.

2) If the claimant does not have a severe medically determinable physical or mental impairment – i.e., an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.

3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.

4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.

5) If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.,* 582 F.3d 647, 652 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 404.1520(b)-(g)). The claimant has the burden of proof at the first four steps of the sequential evaluation process. *Id.; Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541,

548 (6th Cir. 2004). Once the claimant establishes a prima facie case by showing an inability to

perform the relevant previous employment, the burden shifts to the Commissioner to show that

the claimant can perform other substantial gainful employment and that such employment exists

in the national economy. *Rabbers,* 582 F.3d at 652; *Harmon v. Apfel,* 168 F.3d 289, 291 (6th

Cir. 1999).

### B. The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of

fact and conclusions of law:

> 1. The [plaintiff] last met the insured status requirements of the Social Security
> Act on December 31, 2014.

> 2. The [plaintiff] did not engage in substantial gainful activity during the period
> from his alleged onset date of July 28, 2009 through his date last insured of
> December 31, 2014 (20 CFR 404.1571, *et seq.*).

> 3. Through the date last insured, the [plaintiff] had the following severe
> impairments: degenerative disc disease of the cervical, thoracic, and lumbar spine,
> chronic pain syndrome, coronary artery disease with hypertension, an umbilical
> hernia, diabetes mellitus, obstructive sleep apnea, status-post bilateral knee
> surgeries, and depressive, anxiety, and pain-based disorders (20 CFR
> 404.1520(c)).

> 4. Through the date last insured, the [plaintiff] did not have an impairment or
> combination of impairments that met or medically equaled the severity of one of
> the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR
> 404.1520(d), 404.1525 and 404.1526).

> 5. After careful consideration of the entire record, the undersigned finds that,
> through the date last insured, the [plaintiff] had the residual functional capacity
> [("RFC")] to perform sedentary work as defined in 20 CFR 404.1567(a) except he
> is limited to standing and/or walking for no more than one hour at a time and for a
> total of no more than 5 hours throughout an 8-hour workday, and is limited to
> sitting for no more than one hour at a time and for a total of no more than 6 hours
> throughout an 8-hour workday. The [plaintiff] must be able to make position
> changes between sitting, standing, and walking while at the workstation for up to

5 minutes per hour. He can never climb ladders, ropes, or scaffolds, and can only occasionally stoop, kneel, crouch, crawl, and climb ramps and stairs. The [plaintiff] must further avoid more than occasional exposure to extreme cold, extreme heat, and/or humidity, pulmonary irritants, or vibration, must avoid all exposure to unprotected heights and hazardous machinery or equipment, and can never engage in commercial driving. Moreover, the [plaintiff] is limited to understanding, remembering, and carrying out instructions involving simple and routine tasks in an environment free from fast-paced production rates such as seen with assembly line work, strict hourly production rates, or quotas, which involve no more than occasional changes in workplace settings or duties, and which permit advance notice and a demonstrated explanation of all such changes. The [plaintiff] is further limited to occasional interaction with supervisors, co-workers, and the public, and will be off-task for up to 10% of the workday exclusive of regularly scheduled breaks.

6. Through the date last insured, the [plaintiff] was unable to perform any past relevant work (20 CFR 404.1565).[2]

7. The [plaintiff] was born [in] . . . 1970 and was 44 years old, which is defined as a younger individual age 18-44, on the date last insured. [Plaintiff] subsequently changed age category to a younger individual age 45-49 (20 CFR 404.1563).

8. The [plaintiff] has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the [plaintiff] is "not disabled," whether or not the [plaintiff] has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Through the date last insured, considering the [plaintiff]'s age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the [plaintiff] could have performed (20 CFR 404.1569 and 404.1569(a)).[3]

---

[2] Plaintiff's past relevant work was as a welder, a medium, skilled position which plaintiff performed at a very heavy exertion level; a truck driver, a medium exertion, semi-skilled position; and an excavation driver, an unskilled, medium exertion position which plaintiff performed at the very heavy exertion level. (Tr. 48, 107-08).

[3] The ALJ relied on the VE's testimony to find that plaintiff would be able to perform the requirements of representative sedentary unskilled jobs of addressing clerk, with 200 jobs locally and 30,000 jobs nationally; surveillance system monitor, with 200 jobs locally and 25,000 jobs nationally; and ticket sorter, with 500 jobs locally and 80,000 jobs nationally. (Tr. 49).

11. The [plaintiff] was not under a disability, as defined in the Social Security Act, at any time from July 28, 2009, the alleged onset date, through December 31, 2014, the date last insured (20 CFR 404.1520(g)).

(Tr. 33-49).

## C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a two-fold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers*, 582 F.3d at 651 (quoting *Bowen*, 478 F.3d at 746).

*See also Wilson*, 378 F.3d at 545-46 (reversal required even though ALJ's decision was otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

### D. Plaintiff's testimony

Plaintiff testified at the ALJ hearing that he saw internist Dr. Chetna Mital, M.D., in 2012 for constant fatigue and a sense of pressure on his chest. (Tr. 90). He became exhausted, his heart rate increased, and he became short of breath if he exerted himself. (Tr. 91). Dr. Mital ordered an echocardiogram and plaintiff started seeing a cardiologist, Dr. Lester Suna, M.D., in April 2012. (*Id.*). Plaintiff felt that his condition had worsened between April 2012 and December 2014 because he was not sleeping well, he was constantly fatigued, he was shorter of breath and he had more frequent chest pains. (Tr. 92-93). Dr. Suna imposed restrictions against lifting more than ten pounds and postural/environmental restrictions. (Tr. 94). Plaintiff also participated in a sleep study for obstructive sleep apnea and was prescribed a CPAP machine, which he stopped using because it gave him nightmares and he ripped the machine off in his sleep. (Tr. 94-96). Dr. Suna prescribed Nitroglycerin and Ranexa for angina. (Tr. 96). Plaintiff underwent a cardiac catheterization stress test in December 2012. Plaintiff testified that he returned to a welding job for three weeks in late 2014 but he was terminated because sleep apnea interfered with his sleep and caused him to be late (Tr. 75-76), and he had to take one day off to see the doctor because his back pain had increased. (Tr. 75). Plaintiff testified at the hearing that he could stand about 30 minutes without getting increased low back pain, sit 30

to 45 minutes, and lift 10 to 15 pounds. (Tr. 81-82). He rated his lower back and thoracic pain as 5 to 8 daily on a scale of 1 to 10. (Tr. 83-84).

Plaintiff began cognitive and behavioral therapy with Dr. Tricia Geissler, Psy.D., in August of 2013. (Tr. 98). He also saw a psychiatrist, Dr. Michael Miller, M.D., for several months before he stopped because he did not think the treatment was helping. (Tr. 99). Plaintiff thought that his psychological condition improved briefly prior to December 31, 2014, and that therapy helped him. (Tr. 100).

Plaintiff testified that his lower back pain would prevent him from doing a job that requires sitting and that he can sit only 30 to 45 minutes before he must stand up and stretch. (Tr. 103-04). Plaintiff testified that the pain makes it hard to stay focused. (Tr. 104).

### E.  Specific Errors

On appeal, plaintiff argues that the ALJ failed to properly weigh the medical opinions of treating cardiologist Dr. Suna and treating psychologist Dr. Giessler. (Docs. 10, 16).

### 1.  *Treating physician standard*

It is well-established that the findings and opinions of treating physicians are entitled to substantial weight. Under the treating physician rule, "greater deference is generally given to the opinions of treating physicians than to those of non-treating physicians. . . ." *Rogers*, 486 F.3d at 242; *Wilson*, 378 F.3d at 544. The rationale for the rule is that treating physicians are "the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone." *Rogers*, 486 F.3d at 242.

A treating source's medical opinion must be given controlling weight if it is (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques," and (2) "not inconsistent with the other substantial evidence in [the] case record[.]" 20 C.F.R. § 404.1527(c)(2)[4]; *see also Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013). If a treating source's medical opinion is not entitled to controlling weight, the ALJ must apply the following factors in determining what weight to give the opinion: the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source. *Wilson*, 378 F.3d at 544. *See also Blakley*, 581 F.3d at 408 ("Treating source medical opinions [that are not accorded controlling weight] are still entitled to deference and must be weighed using all of the factors provided in" 20 C.F.R. § 404.1527(c)) (quoting Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *4)[5]. In addition, an ALJ must "give good reasons in [the] notice of determination or decision for the weight [given to the claimant's] treating source's medical opinion." 20 C.F.R. § 404.1527(c)(2). The ALJ's reasons must be supported by the evidence in the case record and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's

---

[4] The regulation was in effect until March 27, 2017, and therefore applies to plaintiff's claim filed in 2013. For claims filed on or after March 27, 2017, all medical sources, not just acceptable medical sources, can make evidence that the Social Security Administration categorizes and considers as medical opinions. 82 FR 15263-01, 2017 WL 1105348 (March 27, 2017).

[5] SSR 96-2p was rescinded effective March 27, 2017, when the Social Security Administration published final rules that revised the rules and regulations applicable to the evaluation of medical evidence for claims filed on or after that date. Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 FR 5844-01, 2017 WL 168819, at *5844-45, 5869, 5880. Since plaintiff's claim was filed in 2013, SSR 96-2p applies to this case. *See Shields v. Comm'r of Soc. Sec.*, 732 F. App'x 430, 437 n. 9 (6th Cir. 2018).

medical opinion and the reasons for that weight. *Gayheart*, 710 F.3d at 376 (quoting Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *5). This requirement serves a two-fold purpose: (1) it helps a claimant to understand the disposition of his case, especially "where a claimant knows that his physician has deemed him disabled," and (2) it "permits meaningful review of the ALJ's application of the [treating-source] rule." *Wilson*, 378 F.3d at 544.

Opinions from non-treating and non-examining sources are never assessed for "controlling weight." A non-treating source's opinion is weighed based on the medical specialty of the source, how well-supported by evidence the opinion is, how consistent the opinion is with the record as a whole, and other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c)(3)-(6); *Wilson*, 378 F.3d at 544. Because a non-examining source has no examining or treating relationship with the claimant, the weight to be afforded the opinion of a non-examining source depends on the degree to which the source provides supporting explanations for his opinions and the degree to which his opinion considers all of the pertinent evidence in the record, including the opinions of treating and other examining sources. 20 C.F.R. § 404.1527(c)(3).

### 2. *Weight to the treating physician, Dr. Suna*

#### i. *Medical treatment history*

Plaintiff saw internist Dr. Mital to establish care in March 2012. He complained of high blood pressure, fatigue, and palpitations and an elevated heart rate, even at rest. (Tr. 468-70). Plaintiff underwent an echocardiogram the next month that showed normal left ventricular function, absence of wall motion abnormalities, a left ejection fraction between 60% to 65%, and

a grade I diastolic dysfunction consistent with impaired relaxation and normal filling pressures. (Tr. 489-91).

Plaintiff began treating with cardiologist Dr. Suna in April 2012 on referral from Dr. Mital. (Tr. 543-46). He complained of high blood pressure, palpitations, and some chest pain and reported an episode of diastolic blood pressure over 105 and a heart rate greater than 100. (Tr. 543). Dr. Suna prescribed Metoprolol and ordered a Lexiscan Myoview to evaluate hypertension, diabetes and a positive family history for coronary artery disease (CAD). (Tr. 546). Plaintiff underwent a Myocardial Perfusion Study in late April that disclosed normal results. (Tr. 494). When seen for follow-up in May 2012, plaintiff reported his blood pressure the prior day had been 183/96. (Tr. 549). Dr. Suna reported the nuclear stress test was normal, he advised plaintiff to take an extra Metoprolol for heart racing and stressed the importance of smoking cessation, and he scheduled plaintiff for follow-up in six months. (Tr. 552). In November 2012, plaintiff reported his "heart is jumping out of his chest" with associated shortness of breath, dizziness, and feeling like he was going to pass out. He also reported episodes of nausea and vomiting in the past month when he got "stressed out," waking up throughout the night gasping for air, loss of appetite, and short-term memory loss. (Tr. 556-57). His blood pressure was 138/82 and his pulse was 72. (Tr. 558). Plaintiff reportedly was active but was not exercising regularly. Dr. Suna changed his medication to Toprol and recommended that plaintiff stop smoking. He ordered a heart catheterization[6] to evaluate his chest pain and shortness of breath. (Tr. 559). On December 5, 2012, Dr. Suna saw plaintiff for follow-up and

---

[6] Cardiac catheterization is a medical procedure performed by threading a thin, flexible tube (a catheter) to the heart for purposes of diagnostic testing and treatment. http://www.nhlbi.nih.gov/health/health-topics/topics/cath/.

for follow-up and the procedure was performed, which showed an estimated ejection fraction of 60 with a 40% lesion in the LAD (Left Anterior Descending Artery), 60% lesion in the 1st OM (obtuse marginal branch) Proximal, 60-70% lesion in the 2nd OM Proximal, 30% lesion in the RCA (right coronary artery), and 80% lesion in the right lower ventricle. (Tr. 561-83). The recommended diagnoses were smoking cessation and follow-up with Dr. Suna in six to eight weeks.

At his follow-up appointment on February 6, 2013, plaintiff complained of chest discomfort that was not always related to exertional activities. (Tr. 586-87). He indicated the chest pain was relieved with nitroglycerin and usually occurred in stressful situations. Plaintiff reported he was able to get around, perform activities of daily living, and take care of his children. Dr. Suna indicated the left heart catheterization was "non-obstructive." Dr. Suna was uncertain as to the cause of plaintiff's fatigue and associated symptoms and recommended a sleep study to rule out sleep apnea. He made no medication changes. (Tr. 588). The plan was to see plaintiff in four months for reassessment, but Dr. Suna did not see plaintiff again until January 2105.

In the interim, Dr. Phillip Swedberg, M.D., examined plaintiff for disability purposes on February 19, 2014. (Tr. 689-95). Plaintiff's chief complaint was his back. He had trouble bending forward but his gait and the rest of his musculoskeletal and neuromuscular exam was completely normal. Plaintiff denied chest pain and shortness of breath. His blood pressure was 169/102 and his pulse was 112 and regular. He was diagnosed with low back pain without radiculopathy, sinus tachycardia and hypertension. (Tr. 691). Dr. Swedberg noted that

plaintiff's blood pressure was uncontrolled and he directed plaintiff to seek immediate medical care following the evaluation. He concluded that plaintiff appeared capable of performing at least a mild to moderate amount of sitting, ambulating, standing, bending, kneeling, pushing, pulling, lifting and carrying heavy objects and that plaintiff had no difficulty reaching, grasping, and handling objects. (Tr. 691).

Plaintiff returned to see Dr. Suna on January 26, 2015, after a two-year absence for his history of CAD with modifiable risk factors. (Tr. 767). Plaintiff reported continued chest tightness exacerbated by breathing. Dr. Suna noted it was "[d]ifficult to tell if this is coming from his back/musculoskeletal issues. When the chiropractor adjusts his back, the pain can 'turn off like a light switch.'" Plaintiff reported that he had not been able to stop smoking and that he had dizziness when he stood up too quickly. Plaintiff also reported that he had exertional shortness of breath alleviated with rest. He had been checking his blood pressure every other day and reported it was well-controlled. Plaintiff reported he had experienced tachycardia over 100. His blood pressure was 146/90. Dr. Suna scheduled plaintiff for a four-week follow-up and prescribed Lisinopril. (Tr. 769).

Plaintiff saw Dr. Mital on February 4, 2015, and reported drowsiness, dyspnea, and tightness in his chest. Dr. Mital noted he was "slightly incoherent" and had taken a Xanax and Oxycodone that morning but denied an overdose or illegal drug use. (Tr. 1105). His blood pressure was 70/50 and he was pale in color, had pinpoint pupils, and was drowsy. Dr. Mital had plaintiff transferred to the emergency room for evaluation. (Tr. 1107). On hospital follow-up on February 19, 2015, plaintiff reported no chest pain or shortness of breath. (Tr. 2000). He

reported his blood pressure had been "pretty good." (*Id*.). His cardio rate and rhythm were normal. Plaintiff was scheduled for follow-up in four weeks. (Tr. 1104).

On March 11, 2015, plaintiff complained to Dr. Suna of multiple episodes of low blood pressure with associated near syncope. (Tr. 753-55). He reported his blood pressure ranged from 84 with associated grogginess and fatigue to 170-180 when he became agitated. Plaintiff stated he was always fatigued and became dizzy when standing up from a squat or sitting position. He also reported random episodes of chest discomfort, which he described as an ache, that occurred at rest. (Tr. 753). Dr. Suna ordered an angiogram to determine if plaintiff's variable blood pressure was a progression of his CAD or diabetic autonomic dysfunction. Dr. Suna discontinued Lisinopril and continued plaintiff on Metoprolol. (Tr. 755).

An angiogram preformed on March 13, 2015 showed progressive disease in distal RCA and two distal branches of RCA, and diffuse disease in LAD, RCA, marginal, that would be poorly amenable to any revascularization procedures. (Tr. 1155). Plaintiff wore a Holter Monitor in April 2015 which showed a heart rate ranging from 45 to 138 and averaging 84, and the results were interpreted to be "unremarkable." (Tr. 1156).

On February 10, 2016, plaintiff was seen by a nurse practitioner in Dr. Suna's practice for follow-up of his CAD. (Tr. 1152). Plaintiff reported "a lot more chest pains/tightness that comes and goes and lasts a few minutes" and several episodes of "blacking out" which happened in connection with episodes of getting angry. His shortness of breath was improving. He was taking Lisinopril, and he reported that his blood pressure and pulse were "everywhere." (*Id*.).

13

His Ranexa dosage was increased to 1000 mg and the recommendation was for follow-up in three months. (Tr. 1156).

On July 13, 2015, Dr. Suna completed a "Cardiac Residual Functional Capacity Questionnaire." (Tr. 1133-37). He reported that plaintiff suffers from Class III NYHA[7] based on clinical examination and cardiac catheterization with symptoms of chest pain, shortness of breath, fatigue, and weakness. He reported that stress may cause plaintiff to have angina. He opined that plaintiff was incapable of low stress jobs due to unpredictable angina and depression caused by his recurrent symptoms. Dr. Suna indicated that plaintiff's cardiac symptoms frequently interfered with his attention and concentration. According to Dr. Suna, plaintiff's prognosis could improve with medical treatment, stress reduction, and smoking cessation. He also opined that plaintiff could not carry/lift any weight, could never stoop or crouch, could not perform any lifting/carrying, could walk one block, could stand/walk for less than two hours per day, and could sit 6 hours per day. He opined that plaintiff would need unscheduled breaks daily and would need to rest 30 minutes before returning to work, and he must avoid all temperature extremes. Dr. Suna concluded that plaintiff was likely to be absent from work more than four days each month.

Dr. Suna completed a "Cardiac Residual Functional Capacity Evaluation- Assessment Prior to 12-31-14" on March 18, 2016. (Tr. 1160-64). Dr. Suna noted on the first page that

---

[7] The American Heart Association's website explains that the NYHA classifies patients with cardiac disease based on their clinical severity and prognosis. Four classes exist, designated as class I -IV. Class III is characterized by: "Marked limitation of physical activity. Comfortable at rest. Less than ordinary activity causes fatigue, palpitation, or dyspnea." https://www.heart.org/en/health-topics/heart-failure/what-is-heart-failure/classes-of-heart-failure

"All condition existed in 2014[.]" Plaintiff's diagnoses were known CAD, poorly controlled diabetes, peripheral neuropathy, and chronic back pain. Dr. Suna reported that plaintiff suffered from daily chest pain that radiated to the jaw and back and occurred at rest, back and leg pain, angina equivalent pain, shortness of breath, fatigue, weakness, and syncope. Dr. Suna found plaintiff had "all bad days," he was incapable of even "low stress" jobs due to recurring chest pain, and he could not be in a work environment due to persistent symptoms and unexpected flare of his condition.

   ii.   *The ALJ did not err in weighing Dr. Suna's opinion*

Plaintiff contends that Dr. Suna's opinion is entitled to "controlling weight." Plaintiff argues that "ample" clinical findings and diagnostic techniques support the opinion because they show a grade 1 diastolic dysfunction and elevated blood pressure and heart rate in April 2012 (Tr. 489-91, 543-46); high blood pressure in May 2012 (Tr. 549-52); reported symptoms of "heart is jumping out of his chest," associated shortness of breath and dizziness with a feeling he would pass out, nausea, vomiting, gasping for air, loss of appetite, short term memory loss, and blood pressure of 138/152 (Tr. 556-58); cardiac catheterization in December 2012 that disclosed lesions and nonobstructive CAD (Tr. 568-70); February 6, 2013 follow-up with reports of chest pain relieved with 1 mg nitroglycerin (*Id.*); a recommended sleep study to determine fatigue and associated symptoms (Tr. 586-89); a blood pressure reading of 169/102 and a recommendation to seek immediate medical attention for hypertension when seen by Dr. Swedberg in February 2014 (Tr 689-91); and a blood pressure reading of 146/90 when he resumed treatment with Dr. Suna in January 2015 (Tr. 767-69).

15

Plaintiff also alleges that the results of an imaging study performed in March 2015, approximately three months after plaintiff's insured status expired, strongly support Dr. Suna's assessment. (Doc. 10 at 7-10, citing Tr. 1155). The study showed "progressive disease in distal RCA and 2 distal branches of RCA, also with diffuse disease in LAD, RCA, marginal that would be poorly amenable to any revascularization procedures with bilat[eral] stenosis of 20-30%." (Tr. 1154). Plaintiff argues the ALJ erred by ignoring the angiogram and failing to consider how the findings would have impacted plaintiff's limitations prior to the date last insured. Plaintiff alleges the angiogram is consistent with the record as a whole considering that the consultative examining physician, Dr. Swedberg, and the state agency reviewing physicians did not have the angiogram to consider. (Doc. 10 at 10, citing Tr. 689-91, 127-30, 145-48). Plaintiff relies on additional evidence generated after the expiration of his insured status to argue that objective evidence supports Dr. Suna's opinions, including Holter monitor readings from April 2015; a diagnosis of coronary arteriosclerosis of native coronary artery disease in LAD, RCA, marginal that would be poorly amenable to revascularization made in connection with the March 2015 angiogram (Tr. 1156); and an increase in his Ranexa dose to 1000 mg twice daily in February 2016 (Tr. 1152-1158).

Plaintiff argues that even if Dr. Suna's opinions are not entitled to controlling weight, the opinions are entitled to great deference when the regulatory factors that the ALJ must balance in evaluating the opinions are weighed. Plaintiff alleges he treated with Dr. Suna regularly from April 2012 until he lost his medical card; he resumed regular treatment with Dr. Suna in January 2015 after his Medicaid card was reinstated; and the treatment included thorough examinations,

diagnostic tests, and medication. (Doc. 10 at 10, citing Tr. 543-46, 549-52, 556-59, 586-89, 767-69, 753-56, 1152-57). Plaintiff also notes that that Dr. Suna is a specialist in cardiology.

The ALJ found that Dr. Suna's opinions were not entitled to "controlling weight" because they were "outliers" to the other medical opinions of record, which suggested plaintiff's limitations were nondisabling, and were not supported by the record as a whole, including Dr. Suna's own treatment notes. (Tr. 47). The ALJ instead gave Dr. Suna's assessments "little weight" for reasons the ALJ thoroughly discussed in his written decision. (Tr. 47-48; Tr. 45). The ALJ reasonably found that all of the regulatory factors weighed against crediting Dr. Suna's opinions except for (1) the extended nature of the treatment relationship, and (2) Dr. Suna's area of specialization. The ALJ discounted Dr. Suna's assessments based on the remaining regulatory factors. The ALJ found that (1) Dr. Suna completed the assessments after the date last insured for the period of alleged disability; (2) Dr. Suna reported symptoms that were "not readily apparent from the limited cardiac-based treatment records arising during the period under review"; (3) Dr. Suna's reports of symptoms were only "partially supported" by his treatment records, which appear to have stopped in early 2013; (4) Dr. Suna did not cite objective evidence to substantiate indications on a "checkbox form" that plaintiff was unable to perform even "low stress" jobs and his symptoms would "frequently" interfere with attention/concentration, and he did not provide any basis for his finding that plaintiff would miss more than four days of work each month; (5) Dr. Suna's most recent statements that plaintiff's cardiac symptoms have basically left him "unable to function in any material respect" do not comport with the evidence,

including plaintiff's recent statements regarding his abilities; (6) the evidence as a whole, including plaintiff's brief return to a welding position in 2014 and his provision of care for his children during the period of alleged disability, are inconsistent with Dr. Suna's opinions regarding plaintiff's inability to sit, stand or walk throughout an 8-hour workday and restrictions against any stopping, crouching, lifting or carrying; and (7) many of Dr. Suna's restrictions relate to the psychological impact of plaintiff's symptoms, which is outside Dr. Suna's area of expertise and area of treatment.  (Tr. 45).

The reasons the ALJ gave for discounting the treating physician's assessments are substantially supported by the evidence.  First, substantial evidence supports the ALJ's finding that Dr. Suna's treatment records up to 2013 do not fully document the debilitating symptoms that Dr. Suna reported for the period under review, including chronic weakness, "daily" chest pain, shortness of breath and fatigue.  Plaintiff had five office visits with Dr. Suna between the alleged disability onset date of July 2009 and expiration of his insured status in December 2014: April 2012, May 2012, November 2012, December 2012 and February 2013.  The treatment notes for each of these visits document no change in plaintiff's energy or activity level, no muscle weakness, no fatigue, and no anxiety or depression.  (Tr. 543-45, 549-51, 557-58, 561-63, 587-88).[8]  At his initial visit in April 2012, plaintiff reported only "some chest pain" but no shortness of breath.  (Tr. 543).  Subsequent treatment notes do not report daily chest pain.  (Tr. Tr. 544-610).  Further, a Myocardial Perfusion Study performed in April 2012 and a stress test

---

[8] Although Dr. Suna did not document fatigue in February 2013, he stated that the "root cause of [plaintiff's] fatigue and associated symptoms" was unclear and recommended a sleep study to rule out sleep apnea while making no medication changes.  (Tr. 588).

performed in May 2012 were normal.  (Tr. 494, 549).  Plaintiff reported he was active in May 2012, and at his last visit during the period of alleged disability in February of 2013 he reported he "is able to get around and perform [activities of daily living], takes care of his children."  (Tr. 586).  The treatment records document plaintiff's diabetes but it was not reported to be uncontrolled during this time frame and there was no mention of complications.  (Tr. 587).  In February of 2013, plaintiff was assessed with hypertension, tachycardia, borderline diabetes mellitus which was managed per his primary care physician, tobacco abuse, on and off chest pain, usually with stressful situations, that was usually relieved with one nitroglycerin, and shortness of breath with the chest discomfort.  (Tr. 588).  The hypertension was "benign" and "controlled" when plaintiff returned to Dr. Suna for treatment in January 2015, shortly after plaintiff's insured status had expired.  (Tr. 1156).  The ALJ reasonably found that these treatment records do not document debilitating cardiac limitations during the period of alleged disability.

The ALJ also properly determined that Dr. Suna did not cite objective evidence to support several of his findings on a "checkbox form" Dr. Suna completed, including findings of restrictions related to the psychological impact of plaintiff's impairments which were outside Dr. Suna's area of expertise and area of treatment.  (Tr. 45).  An ALJ does not err by giving a checkbox form little weight "where the physician provided no explanation for the restrictions entered on the form and cited no supporting objective medical evidence."  *Ellars v. Comm'r of Soc. Sec.*, 647 F. App'x 563, 567 (6th Cir. 2016) (court found no error where the treating physician simply noted plaintiff's impairments in the "remarks" section of the checkbox physical

capacity evaluation form) (citing *Rogers v. Comm'r of Soc. Sec.,* No. 99-5650, 2000 WL 799332 (6th Cir. June 9, 2000) ("treating physician's documentation of impairments on form with checked-off boxes was not entitled to great weight when no further explanation given"); 20 C.F.R. § 404.1527(c)(3) ("The better an explanation a source provides for an opinion, the more weight we will give that opinion.").

Here, Dr. Suna, who treated plaintiff for cardiac symptoms, indicated on the checkbox form that plaintiff's condition impacted him psychologically, including by finding that his symptoms would "frequently" interfere with attention/concentration. (Tr. 1134). The ALJ did not err by discounting psychological restrictions based on Dr. Suna's specialization in cardiac care, particularly since Dr. Suna consistently documented in his treatment notes during the period of disability that plaintiff was not anxious or depressed. The regulations permit the ALJ to consider the treating source's area of specialization in weighing the opinion. *See* 20 C.F.R. § 404.1527(c)(5).

The ALJ's finding that Dr. Suna's assessment of debilitating cardiac symptoms is not consistent with the objective test findings and other medical evidence of record is also substantially supported by the evidence. An April 2012 echocardiogram disclosed a Grade 1 diastolic dysfunction (Tr. 489-90) but a Myocardial Perfusion Study performed later that month and a nuclear stress test conducted in May 2012 were normal. (Tr. 547-48, 549). A cardiac catheterization in December 2012 disclosed abnormalities, including non-obstructive CAD, and Dr. Suna made diagnostic recommendations of (1) smoking cessation, and (2) follow-up in six to eight weeks. (Tr. 568-69). In February 2014, consultative examining physician Dr. Swedberg

diagnosed sinus tachycardia; low back pain without radiculopathy with a completely normal musculoskeletal and neuromuscular examination except for difficulty bending forward; and uncontrolled and "untreated" hypertension, for which he directed plaintiff to seek medical care immediately following the examination. (Tr. 691). Dr. Swedberg opined that plaintiff appeared capable of "at least a mild to moderate amount of sitting, ambulating, standing, bending, kneeling, pushing, pulling, lifting and carrying heavy objects." (*Id.*). The ALJ reasonably found that this medical evidence was inconsistent with Dr. Suna's assessment of a debilitating cardiac impairment. *See* 20 C.F.R. § 404.1527(c)(2); *Gayheart*, 710 F.3d at 376.

Plaintiff argues that the ALJ nonetheless erroneously discounted Dr. Suna's assessments on the ground Dr. Suna issued his opinions about plaintiff's functioning during the period of alleged disability only after plaintiff's insured status had expired and did not consider the March 2015 angiogram. (Doc. 10 at 8-10). Plaintiff argues the timing of the assessments is not relevant because Dr. Suna had treated him since April 2012, prior to the date last insured, and Dr. Suna had access to the March 30, 2015 angiogram results showing "progressive and diffuse coronary artery disease which was not amenable to revascularization." (*Id.* at 9). Plaintiff contends that because the angiogram disclosed his cardiac disease was "progressive," not "acute," the test is relevant to his condition during the period of alleged disability and supports Dr. Suna's assessments. (*Id.* at 8; Doc. 16 at 2). Plaintiff also alleges that Dr. Suna's assessments are not inconsistent with the record as a whole because neither the consultative examining physician, Dr. Swedberg, nor the non-examining physicians had the March 2015 angiogram results before them when they provided their opinions. (Doc. 10 at 10). Plaintiff

argues that the ALJ erred by rejecting the treating specialist's opinions without discussing this test. (*Id.*)

The Commissioner contends that evidence generated after a claimant's date last insured is relevant to a disability determination only when it relates back to the period of alleged disability, and plaintiff does not provide any medical or opinion evidence to support his assumption that the angiogram results reflect his condition prior to the date last insured. (Doc. 15 at 8-9, citing cases). The Commissioner contends that the medical evidence developed after the date last insured discloses many of the same findings that were made prior to the date last insured and do not demonstrate that plaintiff's condition was debilitating before the expiration of his insured status. (*Id.* at 9-10).

Plaintiff's insured status for purposes of receiving DIB benefits expired on December 31, 2014, and he therefore cannot be found disabled unless he can establish a disability prior to that date. *Blankenship v. Comm'r of Soc. Sec.*, No. 13-12547, 2014 WL 4801829, at *5 (E.D. Mich. Sept. 23, 2014) (citing *Garner v. Heckler*, 745 F.2d 383, 390 (6th Cir. 1984)). Evidence of disability obtained after the expiration of a claimant's insured status generally has "little probative value." *Strong v. Soc. Sec. Admin.*, 88 F. App'x 841, 845-46 (6th Cir. 2004) (citing *Cornette v. Sec'y of Health & Human Servs.*, 869 F.2d 260, 264 n. 6 (6th Cir. 1988)); *see also Abney v. Astrue*, CIV A 5:7-394, 2008 WL 2074011, at *6 (E.D. Ky. May 13, 2008). Further, a medical provider's statement assessing a plaintiff as "disabled" is of no relevance where there is no indication that the assessment relates back to the time before the date last insured. *Strong*, 88 F. App'x at 845. Where there is substantial evidence from the relevant time period to support

the ALJ's finding that the claimant could perform substantial gainful activity, and the claimant has not presented "any contemporaneous medical evidence of disability from the relevant time period," the claimant has not carried his burden of proving disability. *Id.* at 845-46 (treating physician's retrospective and conclusory opinion that the claimant had been disabled during the relevant period, issued long after the period last insured, was not entitled to significant weight because it was not supported by relevant and objective evidence).

Nonetheless, evidence relating to the post-insured period has some probative value and may be considered by the ALJ to the extent it sheds light on the claimant's health before the expiration of his insured status. *Blankenship*, 2014 WL 4801829, at *5 (citing *Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987); *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988)). *See also Abney*, 2008 WL 2074011, at *6 (medical evidence from the period after the claimant's date last insured is relevant to the disability determination only "where the evidence relates back to the claimant's limitations prior to the date last insured.") (citing *Higgs*, 880 F.2d at 863) (medical evidence from after date last insured did not impact the disability determination because it "was only minimally probative of claimant's condition before date last insured"); *Begley v. Matthews*, 544 F.2d 1345, 1354 (6th Cir. 1976) ("Medical evidence of a subsequent condition of health, reasonably proximate to a preceding time may be used to establish the existence of the same condition at the preceding time.")). Medical evidence from the period after the date last insured, to the extent it relates back to the period of alleged disability, is relevant "only if it is reflective of a claimant's limitations prior to the date last insured, rather than merely his impairments or condition prior to this date." *Id.*; *see* 20 C.F.R. §

404.1545(a)(1) (explaining that the claimant's RFC is the "most you can still do despite your limitations") (emphasis added). While post-date last insured medical records may reveal various diagnoses that the plaintiff was given during the relevant time period, providing a diagnosis at a later time "says nothing about his actual limitations [during the period of alleged disability], and also does not of itself relate back to Plaintiff's limitations prior to the date last insured." *Abney*, 2008 WL 2074011, at *6 (quoting *Higgs,* 880 F.2d at 863).

Where the evidence shows that the claimant's impairment had grown progressively worse over time, dismissing evidence because it was generated after the date last insured may be improper. *Id.* (citing *Blankenship v. Bowen,* 874 F.2d 1116, 1122 (6th Cir. 1989) (by requiring impairments to reach Listing level severity before finding the plaintiff became disabled post-date last insured, the ALJ ignored the slowly progressive nature of the plaintiff's schizophreniform disorder, ignored the severity of that impairment, failed to account for the consultative examining physician's statements about the plaintiff's sullenness and hostility, and gave the appearance the ALJ selected the onset date solely because it fell outside the insured status period). On the other hand, the ALJ does not err by rejecting evidence created "well after the date last insured [that] likely described a deterioration" in the plaintiff's condition and not the plaintiff's condition during the time period at issue. *Johnson v. Comm'r. of Soc. Sec.*, 535 F. App'x 498, 506 (6th Cir. 2013) (ALJ's finding that a questionnaire "created well after the date last insured . . . likely described a deterioration" in the plaintiff's condition rather than the plaintiff's condition during the time period in question was an acceptable reason to give the non-treating physician's opinion greater weight); *Siterlet,* 823 F.2d at 920 (treating physician's report

was "minimally probative" of plaintiff's condition prior to date last insured where the claimant suffered from one or more degenerative disorders and the treating physician first saw the plaintiff after his insured status had expired).

The ALJ did not err by discounting Dr. Suna's opinions on the ground they were issued after the date last insured but applied in part to the period of alleged disability. Dr. Suna issued his first opinion on July 13, 2015, which was over six months after plaintiff's insured status had expired. (Tr. 1133-37). In that assessment, Dr. Suna diagnosed plaintiff with "NYHA Class III" and listed his symptoms as daily anginal pain, shortness of breath, weakness and fatigue. Dr. Suna identified as the underlying clinical findings and test results only the "clinical exam [and] cardiac catheterization." (Tr. 1133). Dr. Suna reported that plaintiff was incapable of even "low stress jobs" because he has "unpredictable angina," and he opined that plaintiff's recurrent symptoms are "very disabling" which "has him depressed." (Tr. 1134). He reported that plaintiff's condition "can improve with medical treatment and stress reduction, smoking cessation." (Tr. 1135). In his subsequent assessment issued in March 2016, Dr. Suna reported he had seen plaintiff every 3-6 months for the last five years and listed additional diagnoses of poorly controlled diabetes, peripheral diabetes, and chronic back pain. (Tr. 1160-64). He reported that plaintiff had chest pain daily that "[r]adiates to the jaw and back" and that he suffered angina equivalent pain. Dr. Suna noted that "All conditions existed in 2014." (Tr. 1160). He reported that plaintiff was incapable of low stress jobs due to "recurring chest pain" and his physical symptoms and limitations caused "tremendous stress [with] inability to work." (Tr. 1161). He reported that all of plaintiff's days were "bad days" and that plaintiff is unable to

be in a work environment due to persistent symptoms and "unexpected flare of condition." (Tr. 1162-63).

The ALJ reasonably determined that Dr. Suna's post-insured status assessment is not consistent with the treatment notes he generated during the period of alleged disability or with the record as a whole. (Tr. 45). Plaintiff's last office visit with Dr. Suna before his insured status expired in December 2014 was on February 6, 2013, nearly two years earlier. (Tr. 586-88). Plaintiff complained of "on and off" chest pain at that time that was not always related to exertional activities and was usually precipitated by stress, but he reported the pain was relieved with nitroglycerin and Dr. Suna did not make any changes to plaintiff's medications at that time. Dr. Suna reported he believed the left heart catheterization was non-obstructive, and he did not attribute plaintiff's fatigue and other symptoms to his heart condition but recommended a sleep study, which disclosed sleep apnea. (Tr. 588; Tr. 94-96). Plaintiff did not see Dr. Suna for two more years until January 2015, when plaintiff reported "continued chest tightness" exacerbated by breathing, which Dr. Suna surmised could be a symptom of plaintiff's back/musculoskeletal issues; exertional shortness of breath alleviated by rest; tachycardia; and well-controlled blood pressure. (Tr. 767). Dr. Suna prescribed Lisinopril but did not order testing or additional treatment at that time. (Tr. 769). Dr. Suna found six months later that plaintiff could not perform even "low stress jobs" due to unpredictable angina that occurred even at rest and depression resulting from his debilitating cardiac symptoms. (Tr. 1134). But Dr. Suna did not document complaints of angina in his January 2015 treatment notes, and the most recent treatment notes from two years earlier document that plaintiff's chest pain was usually relieved

26

with nitroglycerin. (Tr. 588, 2/6/13). Moreover, none of Dr. Suna's treatment notes mention depression. Thus, the ALJ did not err by discounting Dr. Suna's post-insured status assessment completed in July 2015 on the ground it was not relevant to the period under consideration.

Nor did the ALJ err by discounting Dr. Suna's March 2016 assessment on this basis. (Tr. 1160-64). The ALJ reasonably found that Dr. Suna's reported findings in the assessment do not show that plaintiff's cardiac condition imposed debilitating limitations prior to the date last insured. Dr. Suna reported in the later assessment that he had seen plaintiff every 3-6 months for the last five years, when there was actually a two-year gap in treatment. Also, while Dr. Suna noted that, "All conditions existed in 2014," he did not indicate that the severity of the conditions and the functional limitations they imposed likewise dated back to 2014. To the contrary, Dr. Suna's assessment suggests that certain conditions and symptoms had worsened since that time, including plaintiff's cardiac symptoms. Whereas Dr. Suna had reported in the July 2015 assessment that heart disease was the sole impairment (Tr. 1133), he also included poorly controlled diabetes, peripheral neuropathy, chronic back pain and syncope in March 2016. (Tr. 1160). As to plaintiff's cardiac symptoms, Dr. Suna had documented only chest pain that was relieved by nitroglycerin in February 2013 and "chest tightness" in January 2015, but in March 2016 he reported that plaintiff suffered "angina equivalent pain" and chest pain daily that radiated to the jaw and back. (*Id.*). Further, plaintiff required emergency care in February 2015 for a blood pressure of 70/50 and accompanying symptoms (Tr. 1105-07), and in March 2015 he reported variable blood pressure which Dr. Suna suggested could be a progression of his CAD. (Tr. 753-76). Dr. Suna did not make findings in the treatment notes or in the assessment

he completed a few months later that indicate plaintiff's cardiac symptoms became debilitating prior to 2015. Finally, Dr. Suna did not report at any time during or shortly after the period of alleged disability that plaintiff's physical symptoms caused depression, and he did not advise plaintiff during the course of his treatment to avoid stress so as to not precipitate or exacerbate his cardiac symptoms. Thus, the ALJ reasonably found that Dr. Suna's opinion that plaintiff was incapable of even "low stress" jobs due to "recurring chest pain" and that his physical symptoms and limitations caused "tremendous stress [with] inability to work" (Tr. 1161) are not supported by his treatment notes. The ALJ properly discounted Dr. Suna's March 2016 report as being of little probative value because it was issued after the period of disability for the period of alleged disability.

The ALJ also reasonably found that Dr. Suna's assessment of a totally debilitating cardiac impairment was inconsistent with plaintiff's daily activities. (Tr. 42). The ALJ specifically found that plaintiff's return to a welding position in 2014 and his continued care for his children during the period of alleged disability were inconsistent with Dr. Suna's assessment of plaintiff's inability to sit, stand or walk throughout an 8-hour workday and restrictions against any stooping, crouching, lifting or carrying. (*Id.*). Plaintiff alleges it was error for the ALJ to rely on these activities because his return to work was unsuccessful and he had no choice but to care for his children. Yet, plaintiff's own reports of his activities do not corroborate Dr. Suna's opinion that plaintiff's cardiac impairment was totally debilitating prior to December 2014. Plaintiff reported to consultative examining psychologist Dr. Andrea Johnson, Psy.D., in January 2014 that he typically maintained a regular daily routine of caring for himself and his children,

28

performing household and personal chores and running errands, and he was able to drive. (Tr. 683). He asserted that his back problems interfered with his efficiency some days and that his diabetes interfered with his daily functioning at times, but the report does not indicate that plaintiff's back and diabetes symptoms were debilitating and it makes no mention of cardiac symptoms. Further, plaintiff testified that he was terminated from his welding position in late 2014 because of issues caused primarily by sleep apnea and back pain. (Tr. 75-76). The ALJ did not err by relying on plaintiff's reports of his daily activities and his brief return to a welding job to discount Dr. Suna's assessment that plaintiff suffered from a debilitating cardiac impairment.

In addition, the frequency and nature of the treatment plaintiff received are not indicative of a completely debilitating cardiac impairment, particularly when the considerable gap in treatment is taken into account. Plaintiff's office visits with Dr. Suna were relatively infrequent, their frequency varied little over time, and there was a substantial treatment gap during the period of alleged disability. Plaintiff initially saw Dr. Suna and underwent testing in April and May 2012, nearly three years after the alleged onset date. (Tr. 543-46, 494). Plaintiff next saw Dr. Suna six months later in November 2012 and underwent testing in December 2012. (Tr. 556-59, 568, 580). Plaintiff saw Dr. Suna again in February 2013, and he was referred for a sleep study which apparently disclosed sleep apnea. (Tr. 586-88, 94-96). Plaintiff did not see Dr. Suna again until two years later in January 2015, after plaintiff's insured status had expired. (Tr. 767). Dr. Suna prescribed Lisinopril but did not order any testing or additional treatment at that time. (Tr. 769). Dr. Suna changed plaintiff's medications in March 2015 and ordered an

angiogram to determine if recent symptoms were a progression of his CAD. (Tr. 753-55; *see* Tr. 1105-1107). There is no evidence that Dr. Suna ordered additional treatment or saw plaintiff more frequently after obtaining the angiogram results. The frequency of office visits and the nature of the treatment plaintiff received varied little over time and are not reflective of a debilitating cardiac impairment.

Plaintiff argues that the ALJ placed "undue significance" on the gap in treatment between February 2013 and January 2015. (Doc. 10 at 8-9). Plaintiff alleges that the lapse in treatment is not particularly relevant because his documented medical history both prior to and after his date last insured shows significant problems which support Dr. Suna's assessment, and the lack of treatment cannot properly be equated with a lack of medical problems. (*Id.* at 9). To the contrary, the ALJ acted in accordance with the regulations by factoring plaintiff's sparse treatment history with Dr. Suna into his decision to discount the treating cardiologist's opinions. *Back v. Comm'r of Soc. Sec.*, No. 1:12-CV-988, 2014 WL 360047, at *8 (S.D. Ohio Feb. 3, 2014) (Report and Recommendation), *adopted,* 2014 WL 773809 (S.D. Ohio Feb. 25, 2014) ("contradictions in the treatment notes coupled with the infrequent treatment are appropriate bases for discounting [the treating physician's] opinion) (citing 20 C.F.R. § 404.1527(c)); *cf. Harris v. Comm'r of Soc. Sec.*, No. 1:09CV448, 2011 WL 167279, at *6 (S.D. Ohio Jan. 19, 2011) ("short length of treatment relationship and the infrequent examinations both justify decreasing the weight [the treating physician's] opinion deserves.").

Plaintiff also suggests the ALJ improperly evaluated Dr. Suna's opinions because the lapse in care was "due to the loss of his Medicaid card" and he "did obtain medical insurance and

resume treatment with Dr. Suna shortly after his date last insured, on January 26, 2015." (Doc. 10 at 8-9). However, plaintiff has not pointed to any evidence in the record to show that his lack of insurance precluded him from obtaining treatment for a two-year period. The treatment records do not mention a loss of insurance coverage or explain the lengthy gap in plaintiff's treatment. Dr. Suna reported on January 26, 2015 that he saw plaintiff for a follow-up visit on that date, he had seen plaintiff two years earlier, and plaintiff had a "history of CAD, with modifiable risk factors, including hypertension, diabetes, hyperlipidemia and tobacco abuse." (Tr. 767-69). Defendant notes that agency records report that he informed a state agency representative in May 2014 that he had lost his insurance "a number of months ago," but there is no specific indication of when plaintiff lost his insurance coverage and of how long he remained uninsured. (Tr. 142). The ALJ therefore did not err by failing to take a lapse in medical insurance into account when weighing Dr. Suna's opinion. The ALJ was entitled to discount Dr. Suna's assessment of debilitating functional limitations based on plaintiff's failure to pursue treatment for an extended time period during the alleged period of disability.

The ALJ gave "good reasons" for affording Dr. Suna's July 2015 and March 2016 assessments "little weight." Those reasons are substantially supported by the evidence of record. Plaintiff's first assignment of error should be overruled.

### 3. Weight to the opinion of the treating psychologist, Dr. Giessler

#### i. *Psychological treatment history*

Plaintiff initiated therapy with Dr. Tricia Giessler, Psy.D., on August 12, 2013 and continued to treat with Dr. Giessler through the date of the ALJ hearing. (Tr. 712-47, 1199-1205). Plaintiff presented with a depressive disorder with multiple depressive symptoms and with chronic pain related to his industrial injury. (Tr. 735). His therapy sessions focused on his struggles with pain, physical limitations, loss of hobbies/interests, family strain, and stress. Plaintiff also saw Dr. Michael Miller, M.D., a psychiatrist, for medication management from September 2013 through at least October 2014. (Tr. 705-10). Dr. Miller prescribed Effexor, Wellbutrin, and Trazadone.

Dr. Giessler prepared a mental health notes summary on behalf of the Ohio Bureau of Workers' Compensation ("BWC") on five dates: August 15, 2013, October 17, 2013, December 20, 2013, February 24, 2014, and May 1, 2014. (Tr. 722, 726, 729, 732, 736). She reported that plaintiff received supportive and cognitive behavioral therapy for depression. She opined that his prognosis was fair and he had shown improved progress. His treatment goals included decrease depressed mood, improve self-care, increase utilization of coping skills and reframe negative thoughts, and improve stress tolerance and coping with pain. Dr. Giessler opined in each report that plaintiff was "currently unable to work." (*Id.*).

On November 11, 2014, Dr. Giessler wrote a letter in response to a report issued by Dr. Donald Tosi for workers' compensation purposes in which Dr. Tosi opined that plaintiff had reached "maximum medical improvement" for his depressive disorder. (Tr. 713-14). Dr.

Geissler opined that plaintiff had not reached maximum medical improvement and remained "temporarily and totally disabled" due to his depressive disorder. (Tr. 713). She wrote that she had counseled plaintiff every one to two weeks since August 2013 and treatment sessions had focused on "building cognitive and behavioral coping strategies to decrease[] his depressed mood, improve his stress tolerance and improve his self-care" and "improv[e] coping with his chronic pain and physical limitations." She reported that plaintiff had made some gains in decreasing depressed mood and suicidal ideation, learning cognitive strategies to reframe negative, ruminative thoughts, improving self-care and limit-setting to lower his stress level; however, despite some gains, plaintiff continued to struggle with a "marked depressed mood and with being easily overwhelmed," as well as a low tolerance for stress and frustration. Dr. Geissler reported that when his pain and stress increased, his depressive symptoms worsened and he had struggled to consistently apply coping strategies. She reported that future treatment sessions would focus on relapse prevention during periods of worsening pain or stress and building additional coping strategies to improve his stress tolerance and decrease his depressed mood. She noted that the BDI-2 (Beck Depression Inventory) test to measure depressive symptoms which Dr. Tosi had administered showed plaintiff's depression was in the "severe" range, which indicated he continued to experience significant difficulties with his depressive symptoms but that there was much room for improvement. (Tr. 714). She opined that the most significant stressors were his "injury and resultant severe chronic pain and limited functioning." Dr. Giessler reported that Dr. Miller continued to make changes to plaintiff's medication regimen, having recently adjusted the Trazadone dosage, and that he could not be considered to

be at a treatment plateau until he was on a stable medication dosage for several months. She concluded:

> [P]laintiff does continue to experience significant difficulties with depressive symptoms and low stress tolerance. He continues to experience significant difficulties coping with his injury and resultant severe chronic pain and physical limitations. With additional psychotherapy treatment, as well as with additional adjustments to his psychiatric medication, [plaintiff] can be expected to make additional fundamental and functional gains in managing his depressive symptoms. Therefore, it is my professional opinion that [plaintiff] has not reached maximum medical improvement for his Depressive Disorder. He continues to be temporarily and totally disabled due to his Depressive Disorder.

(*Id.*).

On March 22, 2016, Dr. Giessler completed a Medical Assessment of Ability to do Work Related Activities (Mental) for the period prior to December 31, 2014. (Tr. 1140-44). Dr. Giessler opined that plaintiff had no ability to maintain attention and concentration and deal with work stresses; fair ability to follow work rules; and poor ability to relate to co-workers, deal with the public, use judgment, interact with supervisors, and function independently. Dr. Giessler explained that due to his depression and low stress tolerance, plaintiff cannot tolerate stress at work and cannot focus on or attend to work tasks. According to Dr. Giessler, plaintiff becomes easily frustrated and agitated in interactions with others, he has low motivation, and he would have difficulty persisting with work tasks. Dr. Giessler also opined that plaintiff's ability to understand, remember, and carry out even simple instructions was poor, and he had no ability to understand, remember and carry out complex or detailed job instructions. She opined he would have difficulty persisting with work tasks due to depression or stress. She further noted that plaintiff had poor ability to maintain personal appearance and demonstrate reliability, and he had

no ability to behave in an emotionally stable manner or to relate predictably in social situations. She opined that plaintiff's low stress tolerance and depression make it very difficult for him to be emotionally stable at work, particularly in high stress situations, and he could not be reliable due to stress, pain and the need for frequent breaks. She also reported that his sleep was impaired due to depression, pain and stress, which makes focusing on work tasks very difficult. She opined he needs frequent breaks "for rest [and] relaxation" and is easily overwhelmed and agitated; therefore, he could not be stable at work. She opined he would be off task 75-100% of the workday. Dr. Giessler concluded that plaintiff's impairments were likely to produce "good days" and "bad days" and he would likely be absent from work four or more days per month.

Dr. Giessler also completed an assessment of plaintiff's current functioning in March 2016 that differed little from the assessment of his functioning for the period of alleged disability. (Tr. 1145-50). Dr. Giessler opined that plaintiff's functioning had decreased to the extent that he had no ability to deal with the public, use judgment, interact with supervisors, and function independently and no ability to understand, remember, or carry out even simple job instructions.

Consultative examining psychologist Dr. Johnson evaluated plaintiff in January 2014 for disability purposes. (Tr. 681-86). Plaintiff reported that he lived with his four children and maintained adequate relationships with his friends and family. He had some hobbies and social activities but he typically stayed home because he lacked energy and motivation to do anything. Plaintiff reported a history of some mental health treatment and a formal diagnosis of depression, and his psychiatrist had prescribed Xanax to manage anxiety. Dr. Johnson assessed Unspecified

Depressive Disorder. She opined that plaintiff would have some difficulties with job-related tasks due to his mental health problems but he would be able to apply instructions requiring low-average intellectual functioning; he presented as able to concentrate on questions and tasks but may work at a slower pace than his peers on tasks requiring rapid timed performance, and his mental health problems would likely cause a pattern of periods away from work; he interacted adequately during the current evaluation and had a history of no interpersonal problems with supervisors, coworkers and customers; he is likely to respond appropriately to coworkers in a work setting; and based on his self-reported history, he is able to respond appropriately to work stressors and situations, was currently experiencing some stressors, and appeared to have adequate social supports in place to effectively cope with additional stressors.

*ii. Weight to the psychological assessments*

The ALJ found that Dr. Geissler's opinions were not entitled to "controlling weight" and instead gave "little weight" to her opinions. (Tr. 46-47). First, the ALJ discounted Dr. Giessler's November 2014 opinion that plaintiff was "temporarily and totally disabled" and had not reached "maximum medical improvement." (*Id.*). The ALJ found that her opinion exceeded the scope of her training as a psychologist and addressed concepts that bear no relation to the disability standard for DIB. (Tr. 47). The ALJ discounted the subsequent references in her treatment notes to plaintiff's "ongoing ability to work" (Tr. 711-47) and her medical assessment forms completed in March 2016 for the period prior to December 31, 2014 (Tr. 1139-44, 1145-50) on the grounds her opinions veered into vocational areas outside of Dr. Giessler's training and expertise; were unsupported by any documented clinical findings, including mental

status findings or other objective testing, and instead were based wholly on plaintiff's subjective complaints; failed to comport with the other medical opinions of record, none of which indicated that plaintiff suffers debilitating anxiety or depression or that he required more intensive treatment, additional medication, or inpatient mental health care; and usurped the Commissioner's role to determine whether plaintiff is disabled. (Tr. 47). The ALJ found that all of the regulatory factors other than Dr. Giessler's extended treatment of plaintiff and area of specialization weighed against crediting Dr. Giessler's opinions. (Tr. 48).

Plaintiff argues that the ALJ erred by discounting Dr. Giessler's opinions. (Doc. 10 at 11-15). Plaintiff alleges Dr. Geissler's assessments are supported by her extensive notes that report "continued stress, anxiety, and depressed mood primarily due to his frustration with pain and physical problems." (Doc. 10 at 14, citing Tr. 712-47, 1176-1205). Plaintiff also notes that he saw a psychiatrist several times for one year between October 2013 and October 2014, who prescribed Wellbutrin, Effexor and Trazadone (Tr. 705-10); Dr. Geissler referenced objective testing (the BDI-2) which indicated his depression was in the severe range (Tr. 713-14); and Dr. Giessler indicated in her November 2014 letter to the BWC that medication changes had occurred by stating that Dr. Miller had increased plaintiff's Trazadone dosage in October 2014 and plaintiff could not be considered to be at a "treatment plateau" until "he had had several months at a stable dosage of medication" (Tr. 713, 714); Dr. Geissler's assessments are supported by the length, frequency, nature and extent of the treatment relationship and her area of specialization; the assessments are supported by psychological testing and mental status examination notes; and the assessments are partially supported by consultative examining

37

psychologist Dr. Johnson's opinion that plaintiff may work at a slower pace than his peers (Tr.

681-86), which the ALJ accounted for in the RFC, and that plaintiff would show patterns away

from work due to his mental problems, which the ALJ did not account for in the RFC. (Doc. 10

at 14-15).

The ALJ's decision to give Dr. Giessler's opinion less than controlling weight and to

instead give her opinion "little weight" is substantially supported by the record. An ALJ is not

required to accept a medical provider's conclusion that her patient is disabled. 20 C.F.R. §

404.1527(d)(1). Whether a person is disabled within the meaning of the Social Security Act is

an issue reserved to the Commissioner, and a medical source's opinion that her patient is

disabled is not entitled to any special deference. *Id.* *See also Warner v. Comm'r of Soc. Sec.*,

375 F.3d 387, 390 (6th Cir. 2004) ("The determination of disability is ultimately the prerogative

of the Commissioner, not the treating physician.") (citation and brackets omitted). Further, Dr.

Giessler's opinions that plaintiff was "currently unable to work" or "temporarily and totally

disabled" for purposes of the BWC program do not shed light on plaintiff's entitlement to DIB.

*See* Tr. 715, 11/6/14; 719, 7/11/14; Tr. 722, 5/1/14; Tr. 726, 2/24/14; Tr. 729, 12/20/13; Tr. 732,

10/17/13; Tr. 736, 8/15/13. The Ohio workers' compensation statute defines "temporary total

disability" as "a disability which prevents a worker from returning to [the worker's] former

position of employment." *Bayes v. Comm'r of Soc. Sec.*, No. 18-3330, 2018 WL 6266761, at *6

(6th Cir. Nov. 30, 2018) (citing *State ex rel. Crim v. Ohio Bur. of Workers' Comp.*, 751 N.E.2d

990, 993 (Ohio 2001) (referring to Ohio Rev. Code § 4123.56)). Thus, disability as defined for

purposes of social security disability benefits "is a much higher standard than disability for Ohio

workers' compensation purposes." *Id.* *See also* 20 C.F.R. § 404.1504 (other governmental agencies make "benefits decisions for their own programs using their own rules," and a decision by another governmental agency that a claimant is disabled under its criteria is not binding on the Commissioner). The ALJ was not bound to credit the opinions Dr. Geissler gave to the Ohio BWC that plaintiff was currently unable to work and was totally and temporarily disabled for purposes of making the disability determination in this matter.

The ALJ thoroughly explained his reasons for not deferring to Dr. Giessler's opinions, and his reasons are substantially supported by the record. First, the ALJ reasonably discounted Dr. Giessler's opinions because they were not supported by clinical findings and objective evidence. *See* 20 C.F.R. § 404.1527(c)(3) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight" will be given that opinion). Objective evidence in the psychiatric/psychological context includes "medical signs." 20 C.F.R. § 404.1513(b)(1). "[W]hen mental illness is the basis of a disability claim, clinical and laboratory data may consist of the diagnosis and observations of professionals trained in the field of psychopathology. The report of a psychiatrist should not be rejected simply because of the relative imprecision of the psychiatric methodology or the absence of substantial documentation, unless there are other reasons to question the diagnostic techniques." *Keeton v. Comm'r of Soc. Sec.*, 583 F. App'x 515, 526 (6th Cir. 2014) (quoting *Blankenship*, 874 F.2d at 1121) (in turn quoting *Poulin v. Bowen*, 817 F.2d 865, 873-74 (D.C. Cir. 1987)). Thus, in *Keeton*, the Court held that the ALJ erred by rejecting the treating psychologist's opinion as unsupported by other evidence and based on full acceptance of the

39

plaintiff's subjective complaints. *Id.* at 525-26. The Court found that the psychologist's opinion was based only in part on the plaintiff's self-reported symptoms and the psychologist's treatment notes included his own recorded observations of plaintiff's physical symptoms and behavior, such as "above average levels of psychomotor agitation" and "was hypervigilant, suspicious, [and] looked around the room." *Id.* at 526. Further, to the extent the psychologist did rely on plaintiff's self-reported symptoms such as dreams, hallucinations, and flashbacks to the Vietnam War, those reported symptoms had been largely consistent throughout the course of his treatment, and it would have been impossible for a doctor to observe these symptoms. *Id.* at 526-27.

This case is distinguishable from *Keeton*. Unlike the psychologist in *Keeton*, Dr. Giessler documented plaintiff's subjective reports of symptoms and the treatment strategies discussed in counseling but made no mental status findings, she performed no objective testing, and her treatment notes include no clinical or other objective findings. (Tr. 711-47). The ALJ was entitled to discount Dr. Giessler's opinion on the grounds it was based in large part on plaintiff's subjective reports and was not supported by objective findings.

Further, the ALJ properly found that Dr. Giessler's opinion was inconsistent with the assessments of the examining and non-examining providers, who documented a higher level of mental functioning. (Tr. 45-46). Plaintiff reported to consultative examining psychologist Dr. Johnson that his daily routine included caring for himself and his children, performing household chores, running errors, managing his own finances, engaging in hobbies and social activities, and driving, which the ALJ reasonably found was not consistent with allegations of debilitating

mental impairments. (Tr. 45-46). In addition, although plaintiff showed signs of depression at the consultative examination, he did not display outward signs of anxiety at the examination with Dr. Johnson; he demonstrated adequate attention, concentration, judgment and insight; and the potential issues with maintaining pace documented by Dr. Johnson were accommodated in the RFC finding. (Tr. 681-86).

Plaintiff alleges the ALJ erred by finding the mental health assessments of the treating and examining psychologists were inconsistent because Dr. Johnson's findings in January 2014 that plaintiff may work at a slower pace than his peers (Tr. 685) and that he is "likely to show a pattern of periods of time away from work due to his mental health issues," are consistent with Dr. Giessler's opinion. (*See* Tr. 685). Plaintiff argues that the ALJ erred by accounting for only the work pace restriction in the RFC finding and not for plaintiff's likely absences from work. (Doc. 10 at 14-15). The ALJ committed no error in this regard. The ALJ gave "some weight" to the opinions of consultative examining psychologists Dr. Johnson and Dr. Natalie De Luca, Ph.D. (Tr. 697-701) and to the state agency reviewing psychologists for reasons the ALJ thoroughly discussed in his opinion. The ALJ adopted numerous restrictions to account for their assessments of restrictions and plaintiff's mental health limitations. Having declined to give her opinion full weight, the ALJ was not bound to adopt additional limitations to account for Dr. Johnson's general assessment that plaintiff would show a pattern of periods away from work due to his mental limitations.

Finally, the ALJ did not err by discounting Dr. Giessler's opinion that plaintiff possessed little or no ability to function in virtually every area of mental functioning as inconsistent with

the conservative nature of his mental health treatment. *See* 20 C.F.R. § 404.1527(c)(2)(ii)

(nature and extent of treatment relationship are relevant factors). There is no indication in the

treatment record that plaintiff needed more intensive treatment or additional medications for his

mental health impairments during the period of alleged disability. Records showing plaintiff

received only conservative treatment for his mental health impairments is a "good reason" to

discount the treating source opinion. *Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 631 (6th

Cir. 2016).

The ALJ provided valid reasons which are substantially supported by the evidence for

giving only "some weight" to Dr. Giessler's assessments of plaintiff's mental functional

limitations. Plaintiff's second assignment of error should be overruled.

## IT IS THEREFORE RECOMMENDED THAT:

The decision of the Commissioner be **AFFIRMED** and this case be **CLOSED** on the

docket of the Court.

Date: 12/18/18

Karen L. Litkovitz
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

JOSEPH WINSTON CRAWFORD, JR.,  
    Plaintiff,

    vs.

COMMISSIONER OF  
SOCIAL SECURITY,  
    Defendant.

Case No. 1:17-cv-723

Dlott, J.  
Litkovitz, M.J.

## NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO R&R

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas* v. *Arn,* 474 U.S. 140 (1985); *United States* v. *Walters,* 638 F.2d 947 (6th Cir. 1981).